IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10–cv–00023–LTB–KMT

VINCENT E. WELLS,

      Plaintiff,

v.

STEPHEN R. KREBS, M.D., Medical Director, Physician health Partners,
JOSEPH FORTUNATO, M.D., Sterling Correctional Facility,
BARRY GOLDSMITH, M.D., Sterling Correctional Facility,
PAULA FRANZ, M.D., Medical Director, Colorado Department of Corrections,
JO ANNE STOCK, P.C., Sterling Correctional Facility,
BEVERLY DOWIS, Health Service Administrator, and
CHERYL SMITH, Clinical Chief of Operations, Colorado Department of Corrections,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Kathleen M. Tafoya**
**United States Magistrate Judge**

      This case involves claims that Defendants violated Plaintiff's Eighth and Fourteenth Amendment rights. This matter is before the court on Defendants' "Motion for Summary Judgment" (Doc. No. 57, filed June 15, 2010), "Plaintiff's Motion for Preliminary Injunction and Supporting Memorandum of Law" (Doc. No. 5, filed January 7, 2010), and "Plaintiff's Request for a Temporary Restraining Order" (Doc. No. 31, filed May 3, 2010).

## STATEMENT OF THE CASE

The following facts are taken from Plaintiff's Amended Complaint and the parties' submissions with respect to this Recommendation. Plaintiff is an inmate at the Sterling Correctional Facility (SCF) within the Colorado Department of Corrections (CDOC). (Am. Prisoner Compl. at 2 [Am. Compl.] [filed February 22, 2010].) Plaintiff names as defendants Stephen R. Krebs, M.D., the medical director of Physician Health Partners; Joseph Fortunato, M.D., staff physician at SCF; Barry Goldsmith, M.D., staff physician at SCF; Paula Franz, M.D.[1], CDOC medical director; Jo Anne Stock, P.A., a physician assistant at SCF; Beverly Dowis, Health Services Administrator at SCF; and Cheryl Smith, Clinical Service Administrator at SCF. (*Id.* at 1–3.)

Plaintiff asserts the defendants have "failed to provide [him] with proper and adequate medical care and treatment for hi[s] serious health nedds [sic] . . . for . . . Polycythemia Vera, Deep vein thrombosis/Phlebitis, Hepatitis C, Lupus, degenerative disc disease, malignant neoplasm prostate, hypoglycemia, and an Acromio Clavicular seperation [sic.]." (Am. Compl. at 4.) Plaintiff alleges he was transferred to SCF in December 17, 2007, and the quality of medical care given to him has deteriorated ever since. (*Id.* at 5.) Plaintiff asserts two claims for relief. In Claim One, Plaintiff asserts Defendants have denied him adequate medical care and treatment with deliberate indifference in violation of his rights under the Eighth and Fourteenth Amendments. (*Id.* at 6.) In Claim Two, Plaintiff asserts Defendants have "established a pattern

---

[1]Plaintiff misspells Defendant Frantz's name as "Franz." Hereinafter the court will refer to this defendant with the correct spelling of "Frantz."

of denying [him] adequate and proper medical care . . . in violation of Plaintiff's rights under the 'Due Process Clause' of the [F]ourteenth Amendment . . . and the Eighth Amendment . . . ." (*Id.* at 11.) Plaintiff seeks compensatory damages, punitive damages, and injunctive relief. (*Id.* at 19.)

## PROCEDURAL HISTORY

Plaintiff filed his Amended Prisoner Complaint on February 22, 2010. (Am. Compl.) Defendants filed their Answer on June 15, 2010. (Doc. No. 56.) Defendants also filed their "Motion for Summary Judgment" on June 15, 2010. (Mot. Summ. J.) Plaintiff filed his "Response to Defendants' Motion for Summary Judgement [sic]" on August 2, 2010. (Resp.) Defendants filed their "Reply Brief in Support of Defendants' Motion for Summary Judgment" on August 12, 2010. (Reply.)

Plaintiff filed his "Motion for Preliminary Injunction and Supporting Memorandum of Law" on January 7, 2010 (Mot. Prelim. Inj.) and his "Request for a Temporary Restraining Order" on May 3, 2010 (Mot. TRO). Defendants filed their "Response to Plaintiff's Motion for Preliminary Injunctive Relief" (Defs.' Resp. Mot. Prelim. Inj.) and their "Response to Plaintiff's Request for a Temporary Restraining Order" (Defs.' Resp. Mot. TRO) on May 27, 2010. Plaintiff filed his "Response to Defendant's [sic] Response to Plaintiff's Motion for Preliminary Injunctive Relief and Temporary Restraining Orders" on June 8, 2010. (Reply. Mot. Prelim. Inj. and Mot. TRO.)

These motion are ripe for review and recommendation.

### *PRO SE* STANDARD OF REVIEW

Plaintiff is proceeding *pro se*.  The court, therefore, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted).  *See also Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers").  However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."  *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991).  A court may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged.  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).  *See also Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues").  The plaintiff's *pro se* status does not entitle him to application of different rules.  *See Montoya v. Chao*, 296 U.S. 952, 957 (10th Cir. 2002).

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing an absence of evidence to support the

nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(e)(2). A disputed fact is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. Moreover, because Plaintiff is proceeding *pro se*, the court, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers"). At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by

the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

## ANALYSIS OF SUMMARY JUDGMENT MOTION

### 1. *Personal Participation*

Defendants argue that summary judgment should be granted in favor Defendant Frantz because she did not participate in the alleged violation of Plaintiff's Eighth Amendment rights. (Mot. Summ. J. at 24.)  Defendants also argue that Defendant Smith did not have any role in alleged violations of Plaintiff's constitutional rights.  (*Id.* at 26–27.)

Personal participation is an essential allegation in a § 1983 civil rights action.  *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976).  To establish personal liability, a plaintiff must show that the official caused the deprivation of a federal right.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  There must be an affirmative link between the alleged constitutional violation and each defendant's participation, control or direction, or failure to supervise.  *See Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993).  Morever, it is well established that a defendant may not be held liable for constitutional violations merely because he or she holds a supervisory position.  *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996).  "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1948 (2009).

### A.      Defendant Frantz

In Claim One of his Amended Complaint, Plaintiff alleges Defendant Frantz

> is cupable [sic] in her Supervisoral [sic] role because on September 22, 2008 an Ultrasound was requested and denied for Plaintiff's left arm, bloodclot basilic vein, defendant Franz, signed off on denial.  October 24, 2008 requested Orthopedic Specialist request and denial was signed off by defendant Franz, and Defendant Franz recommended on-site steroidal injections for Plaintiff; shoulder injury, Recommendation never followed.  December 2, 2008, a second request for Orthopedic specialist by defendant Fortunato, M.D., Denied by defendant Krebs, M.D. signed off by Defendant Franz, No treatment provided. Leaving plaintiff in connual [sic] pain and suffering until this very day.

(Am. Compl. at 9.)

In their Motion, Defendants rely on the Affidavit of Defendant Paula Frantz, M.D., currently the Chief Medical Officer for CDOC, but not Plaintiff's treating physician.  (Mot. Summ. J., Ex. A, ¶ 2.)  Defendant Frantz explains that requests for consultations are reviewed by the Utilization Review Committee (UMC), which is comprised of two CDOC health care providers who review the requests for medical necessity.  (*Id.*, ¶ 37.)  Defendant Frantz states that the requests also are reviewed by Correctional Health Partners for appropriateness according to the nationally accepted Milliman Care Guidelines.  (*Id.*)  Defendant Frantz avers that the requests for Plaintiff's orthopedic consults and the request for an additional ultrasound were denied by UMC and Correctional Health Partners, and that she had no role in any of the denials of those consultations or tests.  (*Id.*)  Defendant Frantz states that she does not personally review consults for approval or denial unless a provider specifically appeals a consult denial by UMC or Correctional Health Partners.  (*Id.*)  Defendant Frantz states that, in Plaintiff's case, no denial

appeals were ever filed, and she had no knowledge of the consult requests on behalf of Plaintiff until she reviewed his medical record for preparation of her Affidavit. (*Id.*)

In response, Plaintiff alleges that "Defndant [sic] Frantz denies any involvement with Medicla [sic] requests made by Providers who are her subordinates. Her name appears in all the denials by Corrections Health Partners, formely [sic] Physician's Health Partners" (Resp. at 5, ¶ 8); that "Plaintiff notified Frantz in letters of the inadequate care and deleiberate [sic] indifferent attitude at Sterling Correctiona [sic] Facility" (*id.* at 9, ¶ 13); that "Franz in her Supervisoral [sic] Role Knows or should know the Standard of Medical treastment [sic] and care that is being provided" (*id.* at 10, ¶ 14); and that "M.D. Franz becomes personally involved when she attests to all reviews, medical proffessional [sic] oppionion [sic], and states that the Plaintiff received 'exceptional' standard of medical treatment" (*id.* at 10, ¶ 15).

Upon review of the extensive medical records submitted by both Plaintiff and Defendants, only two records contain Defendant Frantz's name.[2] One record is a letter dated September 22, 2008, from Defendant Krebs to Defendant Stock, in which "Paula Franz, MD (CDOC)" is copied. (Am. Compl. at 22.) In the letter, Defendant Krebs advised Defendant Stock that the ultrasound of the arm was determined not medically necessary. (*Id.*) The second

---

[2]Defendants have attached extensive medical records to their Motion. The court notes the exhibits have been arranged in reverse chronological order, but have not been bates labeled, and Dr. Frantz fails to reference any of the medical records by date. As such, the court has had to perform time consuming "needle-in-the-haystack" searches to follow the defendants' arguments. The court could strike or deny without prejudice the defendants' motion for this reason alone. However, in the interest of resolving this case in a more expeditious manner, the court declines the invitation to place form over substance.

record is a letter from Plaintiff to Defendant Frantz dated May 22, 2009, in which Plaintiff complains about his medical treatment and care decisions. (Mot. Summ. J., Ex. B, Attach. 6 at 1.) The court is unable to locate a single record showing that Defendant Frantz personally participated in Plaintiff's medical care or that she had any role in the denial of the orthopedic consults or in the denial of the ultrasound request. Plaintiff's suggestion that Defendant Frantz's supervisory authority as the CDOC Medical Director creates a basis for liability is unavailing since "liability under section 1983 cannot rest upon the doctrine of *respondeat superior*." *Ware v. Unified Sch. Dist. No. 492*, 902 F.2d 815, 819 (10th Cir. 1990) (quotation omitted).

Plaintiff has failed to provide evidence—other than his bare assertions—supporting his position that Defendant Frantz acted in a manner that deprived Plaintiff of his constitutional rights. Plaintiff's bare allegations are insufficient to overcome a motion for summary judgment. *See Sullivan v. Scoular Grain Co. of Utah*, 930 F.2d 798, 800 (10th Cir.1991) ("A nonmoving party cannot survive a motion for summary judgment based on bare allegations in the pleadings without supporting evidence."). As Plaintiff has failed to present evidence showing Defendant Frantz personally participated in any of the acts forming the basis of his claims, this court recommends that summary judgment be granted in favor of Defendant Frantz.

### B.    *Defendant Smith*

In his Amended Complaint, Plaintiff alleges Defendant Smith is "cupable [sic] in her supervisoral [sic] role because she investigated several complaints made by plaintiff via mail to Joanie Shoemaker and Paula Franz, defendant, as to plaintiff's serious health needs and the inadequate and lifethreatening [sic] deliberate indifference to plaintiff's health needs, June 20,

2008." (Am. Compl. at 10, ¶ 7.) Defendants argue that Defendant Smith did not have any role in Plaintiff's medical care and did not take any action that violated Plaintiff's constitutional rights. (Mot. Summ. J. at 26–27.)

According to her Affidavit, in her role as Chief of Clinical Operations, Defendant Smith reviews and responds to inmate complaints about their medical care. (*Id.*, Ex. B, ¶ 2.) Defendant Smith states she does not provide medical care to inmates, nor does she make medical decisions about the care inmates should or should not receive. (*Id.*) In June 2009, Defendant Smith reviewed three letters Plaintiff had written to CDOC officials requesting review of his medical care. (*Id.*, ¶ 4.i.; *see id.*, Attachs. 1, 3, 6.) On June 10, 2009, Smith responded to Plaintiff by letter. (*Id.* and Attach. 7.) In the letter, Defendant Smith discussed the concerns raised by Plaintiff. (*Id.*) Defendant Smith states that the June 10, 2009, letter has been her only contact with Plaintiff. (*Id.*, ¶5.)

To the extent Plaintiff asserts Defendant Smith is liable because of her supervisory role, "liability under section 1983 cannot rest upon the doctrine of *respondeat superior.*" *Ware*, 902 F.2d at 819. Plaintiff states in his Response, "the plaintiff [c]ould choose to accept the evidence [Defendant Smith] offered to the pawning off of the Plaintiffs [sic] medical complaints, letters," but then infers that Defendant Smith has "been directed" to destroy or redact evidence. (Resp. at 10, ¶ 17.) However, Plaintiff has failed to make any showing that defendants or anyone at the CDOC has destroyed evidence in this case. Moreover, Plaintiff has failed to provide any evidence of "affirmative link between the alleged constitutional violation and [Defendant

Smith's] participation" in any alleged constitutional violation.  *See*, 992 F.2d at 1055.  As such, this court recommends that summary judgment be granted in favor of Defendant Smith.

## 2.      *Fourteenth Amendment*

Despite Plaintiff's characterization of his claims as violations of his rights under the Eighth and Fourteenth Amendments (*see, e.g.*, Am. Compl. at 6, 11), Defendants do not move for summary judgment on Plaintiff's Fourteenth Amendment claims in their Motion.  Defendant asserts in his Response that his claims are not limited to alleged violations of his Eighth Amendment rights, and that Defendants' alleged denial of medical care violated his right to due process.  (Resp. at 11.)  Defendants argue in their Reply that Plaintiff has failed to make factual allegations to support a Fourteenth Amendment due process claim.  (Reply at 7.)

It is unclear whether Plaintiff invokes the Fourteenth Amendment because the Eighth Amendment applies to the states only through the Fourteenth Amendment or because he is attempting to allege a violation of his substantive due process rights.  The Tenth Circuit Court of Appeals has " noted that where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of substantive due process."  *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (citation omitted).  While a claim made by a pretrial detainee for inadequate medical attention is recognized under the Fourteenth Amendment's due process clause, the same claim made by a convicted inmate such as Plaintiff is recognized under the Eighth Amendment test of deliberate indifference to serious medical needs. *Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir. 1992) (citation omitted).  Thus, the court reviews

Plaintiff's claims for denial of medical care under the Eighth Amendment.  *See Riddle*, 83 F.3d at 1202.

### 3.    *Eighth Amendment*

The Eighth Amendment's ban on cruel and unusual punishment is violated if a defendant's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain."  *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  To establish a claim for deliberate indifference, a plaintiff must first prove that, objectively, his medical need is "sufficiently serious."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (citation omitted).  Second, the plaintiff must prove that, subjectively, the prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health and safety."  *Farmer*, 511 U.S. at 837.  That is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.*  "[T]he subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment."  *Self*, 439 F.3d at 1232.  Medical judgment includes whether a specialist should be consulted, or whether additional medical testing is required.  *Id.*

Although an Eighth Amendment claim regarding deliberate indifference to a serious medical need often involves an official's failure to treat a prisoner's serious medical condition

properly, it may also arise when a prison official acts with deliberate indifference in preventing a prisoner from receiving treatment or denying him access to medical personnel capable of evaluating the need for treatment.  *See Sealock v. Colorado*, 218 F.3d 1205, 12011 (10th Cir. 2000).

> ### *a.  Serious Medical Need*

Defendants argue that Plaintiff does not suffer from lupus, polycythemia vera, prostate cancer, and/or hypoglycemia.  The court construes this argument as one that Plaintiff does not have a sufficiently serious medical need regarding these conditions.

First, Defendants argue there is no evidence that Plaintiff has lupus.  (Mot. Summ. J. at 28.)  Along with his Response, Plaintiff submits a medical record he states is from Swedish Medical Center that he contends "contradicts this allegation . . . ."  (Resp. at 3, ¶ 2.)  The incomplete record indicates a lupus panel was performed on Plaintiff on March 24, 2004, and showed the presence of a lupus anticoagulant.  (Resp. at 16.)  According to Dr. Frantz, Plaintiff does have a history of coagulopathy (a bleeding/clotting disorder) due to the presence of a lupus anticoagulant in his system.  (*Id.*, Ex. A, ¶ 6.)  Dr. Frantz explains that the lupus anticoagulant may be associated with lupus, but the association is not consistent.  (*Id.*)  Dr. Frantz states that Plaintiff has been evaluated at least twice since 2004 for lupus and has not been determined to have lupus.  (*Id.*)  Dr. Frantz explains that the blood test most commonly evaluated to suggest the presence of lupus is the ANA titer.  (*Id.*, ¶ 17.)  According to Plaintiff's records, Plaintiff was seen by Defendant Fortunato on August 13, 2009, with "fear of dying, something wrong . . . ."  (*Id.*, Ex. A, Attach. 2, Part 1, at 32.)  Defendant Fortunato noted that he "[r]eviewed with

13

[Plaintiff] recent labs that are all normal to include ANA, . . ." (*Id.*) Defendant Fortunato also noted that Plaintiff had a "normal phy. exam." (*Id.*) The court has reviewed the extensive medical records provided by the parties and has located no record that indicates Plaintiff ever has been diagnosed with lupus.

Second, Defendants argue there is no evidence that Plaintiff has polycythemia vera. (Mot. Summ. J. at 28.) Dr. Frantz explains that polycythemia vera is a myloproliferative disorder that is typically detected because a patient has either an elevated hematocrit or red blood cell mass. (*Id.*, Exh. A, ¶ 18.) Dr. Frantz states that if a patient is found to have either an elevated hematocrit or red blood cell mass, further workup for polycythemia vera would be done. (*Id.*) Dr. Frantz states Plaintiff does not have an elevated hematocrit or red blood cell mass and that, without these findings, it is medically inappropriate to pursue this diagnosis. (*Id.*) Plaintiff, with his Response, submits a medical record in support of his contention that he has polycythemia vera. (Resp. at 3, ¶ 2; Resp. at 17.) The incomplete record indicates Plaintiff "does have some mild splenomegaly, more <u>consistent with</u> a primary polycythemia vera." (*Id.* at 17 [emphasis added].) Other than this single reference to the <u>possibility</u> that Plaintiff had a symptom consistent with polycythemia vera in 2004, the medical records are devoid of any indication that Plaintiff ever has been diagnosed with the condition.

Third, Defendants argue there is no evidence that Plaintiff has prostate cancer. (Mot. Summ. J. at 28.) In his Response, Plaintiff fails to address this assertion by Defendants. Plaintiff's medical records show that Plaintiff had PSA tests in October 2001, October 2007, and January 2009, all showing results within normal limits. (*Id.*, Ex. B, Attach. 1 at 3; Attach. 2, Part

1, at 53.)  Additionally, a colonoscopy with a biopsy performed on December 21, 2009, revealed "Pt had a normal colon throughout without lesions."  (*Id.*, Ex. A, Attach. 2, Part 1, at 16.)  Though Plaintiff's records do contain several references to a family history of "malignant neoplasm prostate" (*id.*, Ex. B, Attach. 1 at 3) and a reference to a history of prostate cancer in Plaintiff's father (*id.*, Ex. A, Attach. 2, Part 1, at 32), there is no evidence that Plaintiff has ever been diagnosed with prostate cancer.

Finally, Defendants argue Plaintiff does not have hypoglycemia.  (Mot. Summ. J. at 28–29.)  In her Affidavit, Dr. Frantz explains that a "[t]he true diagnosis of reactive hypoglycemia typically requires two low blood sugars."  (*Id.*, Ex. A, ¶ 25.)  The records show that in the time Plaintiff has been incarcerated, there has been only one indication of low blood sugar on November 25, 2009.  (*Id.*, Ex. A, Attach. 2, Part 1, at 22–23.)  Dr. Frantz states that, as the diagnostic criteria for hypoglycemia has not been met, Plaintiff requires no treatment for hypoglycemia.  (*Id.*)  Plaintiff has provided no evidence that he has had more than one low blood sugar result or to dispute the evidence that a diagnosis of hypoglycemia requires at least two blood sugar results.

As Plaintiff has failed to provide evidence—other than the bare assertions in the Complaint—supporting his allegations that he has been diagnosed with lupus, polycythemia vera, prostate cancer, and hypoglycemia, this court cannot find that these conditions are "sufficiently serious" to meet the objective prong as to Plaintiff's Eighth Amendment claims on these conditions.  *Farmer*, 511 U.S. at 834.  As such, Plaintiff has not met his burden of demonstrating that a genuine issue for trial exists on his Eighth Amendment claims related to

lupus, polycythemia vera, prostate cancer, and hypoglycemia, and Defendants are entitled to summary judgment claims related to on these conditions.

Defendants do not address the objective element of Plaintiff's remaining conditions, and instead argue that Plaintiff cannot meet the subjective portion of the legal standard.

### b. *Deliberate Indifference*

#### i. *September 2008 Ultrasound*

Plaintiff asserts Defendant Krebs denied him an ultrasound to detect blood clots in his left arm on September 22, 2008. (Am. Compl. at 7.) Defendant alleges this "[d]enial[ ] caused plaintiff undue pain, suffering and rapid progression in the plaintiff's serious bloodclotting disorder." (*Id.*) Defendants argue that Defendant Krebs did not violate Plaintiff's constitutional rights because whether the test was medically necessary is a matter of disputed medical judgment. (Mot. Summ. J. at 9.)

According to Dr. Frantz, Plaintiff suffers from deep vein thrombosis (DVT), a medical condition in which blood clots form in a vein deep within the body. (*Id.*, Ex. A, ¶ 5.) Plaintiff had an ultrasound of his left arm on June 28, 2008, after he reported to SCF staff that he was experiencing pain in his left arm and chest. (*Id.*, Ex. A, Attach. 2, Part 2, at 17–19, 44.) The June 28, 2008, ultrasound revealed the presence of a non-occlusive clot in his left upper extremity. (*Id.* at 44.) Plaintiff was seen for follow-up on July 1, 2008, and the treating physician's assistant noted, "Even with all of the recent concern about blood clots, [Plaintiff] still missed yesterday's dose of Coumadin. Compliance has been an ongoing issue for him. He even refused several doses in June." (*Id.* at 17.) The physician's assistant increased Plaintiff's

16

Coumadin dosage from 4 mg to 9 mg and noted that "Pt understands and agrees with the plan." (*Id.* at 17.)

On July 4, 2008, Plaintiff was evaluated by SCF medical staff and advised to continue to apply warm packs and to continue the Coumadin dosage as previously ordered. (*Id.* at 16.) On July 7, 2008, Plaintiff was seen again, and the medical staff noted "No palpable mass" and advised Plaintiff take his medications as prescribed. (*Id.* at 15.) On July 24, 2008, Plaintiff was seen by Defendant Stock, who noted, "Has been brought in and lectured about compliance many times. Is still missing several doses a month. Explained that he needs to take Coumadin as ordered, . . ." (*Id.* at 14.) Defendant Stock also noted, "There is no evidence of blood clots in the left arm as he is claiming this morning. He states they swell up by evening, and go down over night. This does not seem to be typical for blood clots." (*Id.*) On August 13, 2008, Plaintiff was seen again by Defendant Stock, who noted, "I don't see anything which would indicate a possible clot in the arm." (*Id.* at 13.) On August 19, 2008, Plaintiff's examination by Defendant Fortunato revealed "nomasses [sic], no axillary masses" and ordered a chest and shoulder x-ray. (*Id.* at 12.) On September 4, 2008, Defendant Fortunato reviewed Plaintiff's chart noted that the chest x-ray ordered at the time of Plaintiff's last visit was normal, but that the shoulder x-ray revealed a possible second-degree shoulder separation. (*Id.* at 11.) On September 16, 2008, Plaintiff was again evaluated by Defendant Stock for complaints of left arm swelling. (*Id.* at 10.) Defendant Stock documented a normal exam of the left arm, but nonetheless requested another ultrasound. (*Id.*)

On September 22, 2008, Defendant Krebs sent a letter to Defendant Stock to advise her that

> the PHP Medical Director reviewed [her] request for an ultrasound of [Plaintiff's] arm. The service(s) requested were determined not medically necessary/covered for the following reason: The information provided does not support the medical necessity for the service requested. Did swelling ever resolve? Is the patient on Coumadin? Is the patient on anti-platelet therapy?

(Am. Compl. at 22.) Defendant Krebs also notified Defendant Stock that she could obtain a coy of the review criteria or treatment guidelines and provided information regarding the appeal process if she disagreed with the decision. (*Id.*)

Defendants assert that Defendant Krebs correctly denied the ultrasound request, as the June 2008 ultrasound had shown the presence of a non-occluding clot, and there was no clinical change by September 2008 to suggest that the clot had progressed or that a new clot had formed. (Mot. Summ. J., Exh. A, ¶30.) Defendants argue that Plaintiff's symptoms were inconsistent with the presence of a clot and that, under these circumstances, an additional ultrasound of the left arm was not medically necessary. (*Id.*)

In the unpublished decision *Fleming v. Uphoff*, the Tenth Circuit addressed similar circumstances. 210 F.3d 389, 2000 WL 374295 (10th Cir. Apr. 12, 2000). In *Fleming*, the plaintiff brought a § 1983 claim for deliberate indifference, alleging that the defendants refused to allow plaintiff to keep an appointment at the Veterans Administration Center in Denver, and the prison institution's contracted health care service provider denied approval for medical tests requested by both Veterans Administration doctors and a private doctor. The district court denied the plaintiff's action for failure to state a claim, and the Tenth Circuit affirmed on the

grounds that "plaintiff's complaint alleged only a difference of opinion regarding the type and timing of medical treatment, which did not constitute actionable deliberate indifference." *Fleming*, 2000 WL 374295, at *2. The Tenth Circuit stated "neither medical malpractice nor disagreement with medical judgment constitutes an Eighth Amendment violation." *Id.* (citing *Estelle*, 429 U.S. at 106; *Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir. 1997)). To show deliberate indifference in such a situation, the plaintiff "must show a deliberate refusal to provide medical attention, as opposed to a particular course of treatment." *Id.*

Plaintiff bases his claim on a difference of medical opinion between Defendant Krebs and Defendant Stock as to the necessity of an ultrasound. As held by the Tenth Circuit, an exercise of medical judgment as to the course of treatment, without a showing of deliberate refusal to provide medical attention, does not represent cruel and unusual punishment and is not actionable under the Eighth Amendment. *Fleming*, 2000 WL 374295, at *3 (citations omitted). As such, Defendant Krebs is entitled to summary judgment on this claim.

### ii.    *2008 Orthopedic Specialist Referrals*

Plaintiff asserts Defendant Krebs denied him an orthopedic specialist for a shoulder separation on October 24, 2008, and December 2, 2008. (Am. Compl. at 7.) Plaintiff also claims that Defendant Fortunato and Defendant Stock denied adequate medical treatment for his alleged AC separation. (*Id.* at 8, ¶ 2; 9 ¶ 5.) Defendants argue that the defendants did not violate Plaintiff's constitutional rights because whether the evaluations were medically necessary is a matter of disputed medical judgment. (Mot. Summ. J. at 9, 13.)

On September 4, 2008, Defendant Fortunato conducted a lab and x-ray review of Plaintiff's chart. (Mot. Summ. J., Ex. A, Attach 2, Part 2, at 11.) Defendant Fortunato noted Plaintiff "had shoulder [x-ray] and was informed needs discussion as has a 2nd degree left acromioclavicular separation as a possibility." (*Id.*) Defendant Fortunato evaluated Plaintiff on October 2, 2008, and noted, "All discomfort today obj is Pect major esp as it borders ant shoulder." (*Id.* at 8.) Defendant Fortunato requested an orthopedic consult. (*Id.*) On October 12, 2008, Defendant Fortunato again saw Plaintiff and advised him "UMC denied Ortho cosult [sic] per my request 10/02/08." (*Id.*) On November 12, 2008, Defendant Fortunato noted that Plaintiff

> has beeen [sic] denied further eval per consult by UMC and PHP. Recommendation for steroid injection is a can not do as inmate has 2 filters inserted both femoral as he has a colaganopathy. At this point honoring said ortho consult would be to assure possibly [sic] anxiety. No tx is expected a stge [sic] 2 separation is rarely repaired and the mear [sic] fact of repairing this in indiv. would expose him to possibility of further clot generation.

(*Id.* at 5.) Defendant Fortunato noted he would "resubmit for ortho consult with clarification this inmate is not qa candidate for anti-inflam or steroid injection." (*Id.*) Upon a thorough review of Plaintiff's entire medical record, it appears Plaintiff last complained of left shoulder pain on November 17, 2008. (*Id.* at 4.)

On June 10, 2009, in response to letters from Plaintiff "regarding [his] concerns with [his] medical care," Defendant Smith, the Chief of Clinical Operations for the CDOC, sent Plaintiff a letter in which she stated, "because you are on lifetime anticoagulation due to a

clotting disorder, you are neither a candidate for surgery or epidural steroid injections. For this reason, Physician Health Partners has denied your requests for surgery." (Am. Compl. at 25.)

Defendants argue there is a medical dispute as to whether Plaintiff suffered from a separated shoulder in the fall of 2008. According to Dr. Frantz, a long-time emergency room physician with extensive experience in the diagnosis and treatment of acromioclavicular (AC) separations, Plaintiff did not suffer from an acute shoulder separation. (Mot. Summ. J., Ex. A, ¶ 31.) Dr. Frantz explains that AC separations are the result of acute trauma, are extremely painful, and the diagnosis is made based on clinical examination and confirmed by x-ray. (*Id.*) Dr. Frantz states that AC separation "has unmistakable clinical presentation and is not found incidentally on x-ray" and "[a] patient with an AC separation cannot move the affected arm due to pain." (*Id.*) Dr. Frantz believes that Plaintiff could not have had an AC separation in late 2008 because when Plaintiff was examined, he was able to move his arm freely, and he had no history of acute trauma. (*Id.*; *see* Ex. A, Attach 2, Part 2, at 4 [noting inmate does not appear to be in acute distress or pain], 6 [noting "does not appear to be anything wrong at this time"], 7 [noting range of motion in left shoulder is normal], 8 [noting rotation of shoulder causes minor discomfort], 9 [noting no swelling or acute distress], 9 [noting normal looking arm with no swelling].) Dr. Frantz believes that an orthopedic consult was unnecessary in the fall of 2008 because Plaintiff did not suffer from an orthopedic condition requiring consultation. (*Id.*, Ex. A, ¶ 32.)

The Tenth Circuit has stated that

> the subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment. Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing. The Eighth Amendment's prohibition on cruel and unusual punishment is not violated when a doctor simply resolves the question whether additional diagnostic techniques or forms of treatment is indicated.

*Self*, 439 F.3d at 1232 (internal citations and quotations omitted). "A claim is therefore actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious." *Id.* Here, where there are differing opinions about whether Plaintiff had an AC separation, it cannot be said that the need for additional treatment was obvious.

Moreover, even if Plaintiff did have an AC separation, Plaintiff cannot satisfy the subjective component. Dr. Frantz states that the appropriate treatment for AC separations is to give the patient a sling and a prescription for pain medication for a short period of time, usually from two to three weeks. (*Id.*, Ex. A, ¶ 32.) Dr. Frantz, Defendant Fortunato, and Physician Health Partners agreed that even if Plaintiff had an AC separation, no orthopedic treatment was indicated because AC separations typically are not surgically repaired, and, due to Plaintiff's lifetime anticoagulation therapy, surgical repair would expose Plaintiff to the risk of further clot generation. (*Id.* ¶ 32; Attach. 2, Part 2, at 5; Am. Compl. at 25.)

A contention that an inmate was denied treatment from a specialist is generally a matter of medical judgment and, thus, insufficient to establish a constitutional violation. *Estelle*, 429 U.S. at 107; *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992). As was discussed in detail above, Plaintiff's complaints of shoulder pain and discomfort were thoroughly evaluated by the

SCF medical staff.  Based on Plaintiff's treatment options and medical history, it was determined an orthopedic consultation was unnecessary.  Importantly, the medical record shows that Plaintiff did not complain of left shoulder pain or discomfort at any time after his exam on November 17, 2008.  (*Id.* at 4.)  "So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met."  *Self*, 439 F.3d at 1233.  Under such circumstances, deliberate indifference is not shown.  *Id.* at 1232–33 ("[W]here a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted.").  Furthermore, Defendants have provided evidence that the treatment provided for Plaintiff's shoulder was reasonable under the circumstances.

Plaintiff has not met his burden of demonstrating that a genuine issue for trial exists, and Defendants Krebs, Fortunato, and Stock are is entitled to summary judgment on Plaintiff's claims related to his alleged shoulder separation.

### iii.  *Deep Vein Thrombosis and Clotting Disorder*

Plaintiff alleges that Defendant Fortunato and the other defendants generally failed to treat his deep vein thrombosis and clotting disorder.  (Am. Compl. at 4; 8, ¶ 2.)  Defendants argue that, to the contrary, they have provided extraordinary and thorough treatment of these conditions.  (Mot. Summ. J. at 14.)

Plaintiff suffers from deep vein thrombosis (DVT), a medical condition in which blood clots form in a vein deep within the body.  (*Id.*, Ex. A, ¶ 5.)  Dr. Frantz explains that CDOC

medical providers monitor Plaintiff's blood clotting rate through a lab test known as the International Normalized Ratio (INR). (*Id.*, ¶ 8.) The INR is a standardized interpretation of the prothrombin time (PT), which is one indicator of the speed at which an individual's blood clots. (*Id.*) The higher the INR number, the longer it takes for the blood to clot; the lower the INR number, the quicker the blood clots. (*Id.*)

According to the Plaintiff's medical record, since his arrival at SCF, he has been examined repeatedly by CDOC physician assistants, nurses, and physicians in response to his complaints and fears of possible blood clots. (*See id.*, Ex. A, Attach. 1 at 5–6, 9–11, 13, 18–20, 25–29, 32, 34–35, 39–41, 49–50, 52; Attach. 2, Part 2, at 5–6, 8–10, 13–16, 18–52.) On July 7, 2008, Plaintiff was seen for complaints of left arm numbness and worries about a clot, and the medical staff noted "No palpable mass." (*Id.*, Attach. 2, Part 2, at 15.) On July 24, 2008, Plaintiff was seen for "concern about blood clots in his arm." (*Id.* at 14.) Defendant Stock found no evidence of blood clots. (*Id.*) On August 13, 2008, Plaintiff complained of numbness and tingling in his left arm." (*Id.* at 13.) On exam, Defendant Stock found "only the triceps muscle which he is stating is a lump" and nothing "that would indicate a possible clot in the arm." (*Id.*) On September 16, 2008, Plaintiff complained of left arm swelling. (*Id.* at 10.) His physical exam "reveal[ed] a normal looking arm" with no swelling or distention of veins." (*Id.*) On October 12, 2008, Defendant Fortunato evaluated Plaintiff and noted Plaintiff was "anxious that may have a clot to left shoulder and forearm." (*Id.* at 7.) Defendant Fortunato explained that "nothing suggtests [sic] clot . . . ." (*Id.*) On November 18, 2009, Plaintiff was evaluated for "concern with his clotting disorder." (*Id.* at 25.) The medical provider noted "no areas of

erythema or tenderness of bil arms or legs" and "Last INR 10/30/09 2.6 which is WNL at 2.0-3.0 for prophylaxis for hx of DVT." (*Id.*) On December 11, 2009, the medical provider noted, "He is concerned with recurent [sic] clots. He has been told that ideal INR for recurrence is 2.5 and 3.5." (*Id.* at 20.) Plaintiff was told he was "at ideal as of lab 11/30/09 @ 3.0." (*Id.*) On December 30, 2009, Plaintiff was evaluated for concerns about his INR level getting too low and swelling or clots in his left leg. (*Id.* at 13.) The medical provider found "no occluding blood clot in leg." (*Id.*) On February 22, 2010, Plaintiff was with complaints of "knots on his lat right leg and in his lower abdomen." (*Id.* at 5.) Defendant Goldsmith noted, "No 'knots' evident on his legs or in his lower abdomen." (*Id.*)

On several occasions, the CDOC medical providers felt Plaintiff's complaints and fears of blood clots warranted further treatment or investigation. For example, on June 28, 2008, Plaintiff was evaluated for complaints of chest pain, which he believed was due to a blood clot. (*Id.*, Ex. A, Attach. 2, Part 2, at 52.) The CDOC staff sent Plaintiff to Sterling Regional Medical Center, where Plaintiff was thoroughly evaluated. (*Id.* at 19–50.) On April 9, 2009, Plaintiff was examined for reports of "some new 'clots' now." (*Id.*, Attach. 2, Part 1, at 40.) His exam showed "several focal indurated areas below skin that are tender on the left or more dependent leg." (*Id.*) Defendant Goldsmith ordered a repeat INR. (*Id.*) On December 15, 2009, Plaintiff was seen for complaints of left-sided leg pain. (*Id.* at 18.) Defendant Stock examined Plaintiff and then consulted with Defendant Goldsmith, who "agrees that there is probably a blood clot there and patient will need anticoagulated." (*Id.*) Defendant Stock requested an "urgent consult" and an ultrasound at Sterling Regional Medical Center. (*Id.*) On January 19, 2009, Plaintiff

presented with "swelling left popliteal fossa." (*Id.* at 49.) Defendant Goldsmith ordered Jobst hose. (*Id.*)

Defendants reason that Plaintiff has received regular and continuous prescriptions for Coumadin, a blood-thinning medication, since he entered CDOC custody, and that CDOC medical staff perform regular testing to monitor his INR. (*Id.*, Ex. A, ¶ 9.) Defendants have attached a chronological list of the INR results of PT testing since Plaintiff's intake processing on March 17, 2005, to March 25, 2010. (*Id.*, Attach. 3.) Defendants state that, from the time Plaintiff arrived at SCF in December 2007 through March 2010, CDOC medical staff have checked Plaintiff's INR approximately 59 times, that Plaintiff's Coumadin prescription has been adjusted as medically necessary, and that Plaintiff's INR has been well controlled. (*Id.*, Ex. A, ¶¶ 12, 13 and Attach. 3.) Dr. Frantz explains that medical studies have shown that most patients have INRs within the therapeutic range 68% of the time. (*Id.*, Ex, A, ¶ 10.) Plaintiff's INR results show he has remained within his therapeutic range for almost his entire time at SCF, with the exception of low periods in May and June-2008, due to his non compliance with medication; a low period for approximately two weeks in April 2009; and a high period for approximately six weeks around February 2009. (*Id.*; Attach. 3.) Dr. Frantz explains that Plaintiff has had "exceptional control of INR's." (*Id.*)

In his response, Plaintiff argues that "the deliberate indifference attitude of defendants' [sic] has caused the Plaintiff several more clots to form, phlebitis to be diagnosed and untreated, and the eventual severe lifethreatening [sic] hospitalization of the Plaintiff, June 27, 28, 29 where he received a blood transfusion . . . ." (Resp. at 3.) It is undisputed that Plaintiff has deep

vein thrombosis and that he was hospitalized in June 2008. However, Plaintiff's allegations are not supported by the record. *See Thomson*, 584 F.3d at 1312. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312. Plaintiff fails to establish that defendants were deliberately indifferent under both an objective and subjective analysis. First, there is no evidence of a deprivation that was sufficiently serious to meet the objective component. A thorough review of Plaintiff's medical records reveals that the CDOC medical staff have monitored and treated Plaintiff's deep vein thrombosis regularly and have carefully and regularly monitored Plaintiff's INR levels. Second, there is no evidence of defendants knowingly disregarding risks to Plaintiff's health. When Plaintiff's blood tests showed abnormal INR levels, his healthcare providers acted reasonably and undertook steps to treat Plaintiff. Based on this record, no issue of disputed fact exists material to Plaintiff's Eighth Amendment claim of deliberate indifference to his deep vein thrombosis and clotting disorder.

### iv. *Lymph Nodes/Cysts on Kidneys/Degenerative Disc Disease*

Plaintiff alleges Defendant Stock denied him treatment for enlarged lymph nodes, cysts on his kidneys, and degenerative disc disease on June 23, 2009. (Am. Compl. at 9.) According to Plaintiff's records, he was seen on March 23, 2009, by Defendant Goldsmith, who noted Plaintiff "[h]as lost 19 lbs since 1/6/09." (Resp., Ex. A., Attach. 2, Part 1, at 43.) Defendant Goldsmith ordered an x-ray of Plaintiff's abdomen. (*Id.*) On March 27, 2009, Defendant

Goldsmith saw Plaintiff in follow-up and noted "X-ray opf [sic] abdomen unremarkable . . . . Will seek CT scan with and wo contrast." (*Id.*) A CT scan of Plaintiff's abdomen was performed on June 27, 2009. (*Id.* at 37–38.) The radiology report revealed "[n]o cause for the patient's weight loss," but did note "L5-S1 degenerative disk disease" and a "minute cortical cyst in the left kidney." (*Id.*)

Plaintiff was seen in the SCF clinic by Defendant Stock on June 23, 2009, for "followup on CT scan." (*Id.* at 36.) Defendant Stock noted:

> Everything is normal, all organs in the abdomen were specifically mentioned. All labs have been normal. I am beginning to think there is nothing wrong with this patient. We cannot find anything abnormal at all. Will refer back to doctor, as I have exhausted my ideas about what to do next.

(*Id.*) Plaintiff was then seen on June 30, 2009, by Defendant Goldsmith, who noted, "Almost all labtests [sic] and CT scans have been normal." (*Id.* at 35.)

According to Dr. Frantz, asymptomatic degenerative disk disease does not require treatment. (*Id.*, Ex. A, ¶ 28.) On March 21, 2005, in his intake "Self Reported History" form, Plaintiff marked that his medical history included "Backache/Joint Pain." (*Id.*, Ex. A, Attach. 2, Part 2, at 65.) The medical provider documented Plaintiff had a history of sciatica in 1997 which had resolved. (*Id.*) Dr. Frantz states upon review of Plaintiff's records she was unable to locate any time where Plaintiff complained of back pain to the CDOC staff. (*Id.*, ¶ 27.) Likewise, this court has reviewed Plaintiff's records, which are devoid of any reference to back ache or back pain.

Dr. Frantz also explains that "The medical record clearly documents multiple examinations by multiple providers, all showing there is no evidence of lymphadenopathy. In addition, the CT scan of the abdomen revealed there was no evidence of lymphadenopathy." (*Id.*, Ex. A, ¶ 29.) Indeed, on July 31, 2009, Plaintiff was evaluated in the clinic with complaints of "lymph nodes being swollen, stated there is something wrong with him. He is demanding there is something wrong with him and when I explain the cat scan was negative he then stated he remembered but still demanding something wrong with him." (*Id.*, Ex. A, Attach. 2, Part 1, at 34.) The provider notes she "palpated the neck nodes and was normal but on the right arm unable to find any swollen nodes, but on the right side did feel small lump. Had another nurse Anita palpate the right arm unable to palpate any lumps." (*Id.*) On August 13, 2009, Plaintiff was evaluated in the clinic with "uncanny fear of dying, something wrong, no spec. body system . . . . Has multi nodules arms neck abd (not true)." (*Id.* at 32.) Defendant Fortunato documented a normal physical exam to include examination for evidence of lymphadenopathy, review of CT scan, and recent normal labs. (*Id.*) Defendant Fortunato documented Plaintiff did not appear to be relieved by the normal physical exam. (*Id.*)

Dr. Frantz states that Plaintiff did not require medical intervention beyond the treatment that SCF medical staff was providing already. (*Id.*, Ex. A, ¶ 41.) Regarding Plaintiff's kidney cysts, Dr. Frantz explains that "[t]his is a common finding and is benign. No treatment is medically necessary for this condition." (*Id.*, ¶ 28.)

In his response, Plaintiff states, "These medical conditions are well documanted [sic] in the Plaintiff's medical history in which he has received medical treatment and therapy." (Resp.

at 3, ¶ 3.)  However, Plaintiff has failed to provide evidence that Defendants "kn[ew] of and disregard[ed] an excessive risk to inmate health and safety."  *Farmer*, 511 U.S. at 837.  As such, Plaintiff has not met his burden of demonstrating that a genuine issue for trial exists on his Eighth Amendment claims related to degenerative disk disease, swollen lymph nodes, or cysts on his kidney.

       ***v.***       ***Weight Loss/Constipation/Pruritis/Abdominal Nodules/Improper Prescriptions***

In addition to the complaints addressed above, Plaintiff alleges Defendant Goldsmith "denied and or injured the Plaintiff with contra-medical treatment for the following serious needs:  February 10, 2009, Defendant Goldsmith, M.D., diagnosis [sic] plaintiff with catastrophic weight loss, constapation [sic], puritis [sic], nodules in the abdomen swollen, thrombis [sic] upper thighs."  (Am. Compl. at 8, ¶ 3.)  Plaintiff also claims that on February 10, 2009, Defendant Goldsmith prescribed "three(3) Contra Hepatitis C liver medications causing palintiff [sic] to bleed profusely, severe headaches, and life threatening pro-thrombin and I.N.R. levels."  (*Id.*)  Finally, Plaintiff alleges that on March 20, 2009, Defendant Goldsmith "over compensates and lowers Plaintiff's anti-coagulant (Coumadin) to 6 mg. from 9 mg. causing thrombis (bloodclots) to form in lower and upper extremeties [sic]."  (*Id.*)

On February 10, 2009, Defendant Goldsmith saw Plaintiff for complaints of weight loss, severe dermatitis with itching over the chest and back, and painful nodules in the abdomen and upper thigh.  (Mot. Summ. J., Ex. A, Attach. 2, Part 1, at 47.)  Defendant Goldsmith noted, "Intensely pruritic maculo papular dermatitis involving the anterior chest and the back.  5-6 mm.

30

lesions in th subcu of the abdomen and upper aanterior [sic] thighs that are exquisitely tender."
(*Id.*)  Defendant Goldsmith ordered lab tests and an abdominal ultrasound and prescribed
medications for the rash and narcotic pain medication.  (*Id.*)  Defendant Goldsmith scheduled
Plaintiff to be evaluated by him two weeks later.  (*Id.*)

On March 20, 2009, Defendant Goldsmith evaluated Plaintiff and noted he "[s]till has
pruritis and has not recived [sic] ntihistamine [sic].  Will prescribe claritin.  Complaoining [sic]
of constipation.  Feels colace is not working . . . .  Will DC and Try lactulose."  (*Id.* at 44.)
Defendant Goldsmith noted Plaintiff's labs were "very good" and that the ultrasound "shows no
elargement [sic] of liver and nml anatomy . . . .  INR is consistently elevated at 4.4.  Will reduce
coumadin to 6 mgm/D and recheck later in wk and for several weeks to come."  (*Id.*)

Dr. Frantz explains that at Plaintiff's height of 5'11", and a normal body mass index
(BMI) in a person of Plaintiff's height is 18 to below 25.  (*Id.*, Ex. a at 20.)  Plaintiff gained
weight after incarceration, and his weight peaked at 192 pounds on October 16, 2007.  (*Id.*;
Attach. 2, Part 2, at 64.)  At this weight, Plaintiff had a BMI of 27.5, which is overweight.  (*Id.*)
Plaintiff then gradually lost weight, and by September 2008 his weight had declined to 186
pounds—a BMI of 26.7.  (*Id.*; Attach. 2, Part 2, at 10.)  Plaintiff explains that Plaintiff's baseline
weight of 171 was recorded upon his intake in 2005, resulting in a BMI of 24.5.  (*Id.*)  Plaintiff
returned to his baseline weight in the low 170s by April 2009.  (*Id.*; Attach. 2, Part 1 at 40–41.)
Plaintiff remained at that weight level through March 2010.  (*Id.*, Attach. 2, Part 1 at 3.)  Dr.
Frantz states that the SCF providers performed an exhaustive and medically appropriate workup

of Plaintiff's complaints of weight loss. (*Id.*, Ex. A, ¶ 20.) The findings were negative, and Plaintiff is now at a normal weight. (*Id.*)

There is no evidence that SCF providers, including Dr. Goldsmith, were indifferent to Plaintiff's complaints of weight loss, pruritis, or abdominal nodules. To the contrary, when Plaintiff presented with complaints of weight loss, the providers ordered tests—all with normal results—and scheduled Plaintiff for further evaluation. (Ex. A, Attach. 2, Part 1, at 44, 47.) On February 10, 2009, Defendant Goldsmith prescribed narcotic pain medication and other medication for Plaintiff's pruritis. (*Id.* at 47.) When Plaintiff complained on March 20, 2009, that the colace was not working for his constipation, Defendant Goldsmith prescribed a different prescription. (*Id.* at 44.) When Defendant Goldsmith noted on March 20, 2009, that Plaintiff still had pruritis, he prescribed Claritin. (*Id.*) On March 23, 2009, Defendant Goldsmith evaluated Plaintiff again and noted Plaintiff's weight loss of nineteen pounds since January 6, 2009. (*Id.* at 43.) Defendant Goldsmith noted that Plaintiff was no longer complaining of pruritis and his abdomen was not distended but that Plaintiff had no stool for five days. (*Id.*) Defendant Goldsmith ordered an x-ray and noted he would "consider CT scan of abdomen and pelvis." (*Id.*) Defendant Goldsmith also ordered lab tests and noted he would have the "results reviewed and patient seen by Dr. Fortunato." (*Id.*) On March 27, 2009, Defendant Goldsmith reviewed Plaintiff's abdominal x-ray and found the results to be "unremarkable." (*Id.* at 42.) Nevertheless, Defendant Goldsmith ordered a CT scan. (*Id.*) On April 9, 2009, Dr. Goldsmith evaluated Plaintiff again and noted that Plaintiff was "[d]oing much betterwith [sic] regards to

abdominal pain.  Much less abdominal pain following use of milk of magnesia and large bowel movement." (*Id.* at 40.)

Regarding Plaintiff's claims that Defendant Goldsmith improperly prescribed medication contraindicated for a person with Hepatitis C and his claims that he developed headaches and bleeding as a result, Dr. Frantz explains that many drugs can interact with Coumadin and affect a patient's INR.  (*Id.*, Exh. A., ¶ 11.)  Dr. Frantz further explains that this does not mean that the drugs should be avoided; it simply means that a patient's INR should be closely monitored when initiating treatment with those medications.  (*Id.*)  As discussed in detail above, Plaintiff's medical records show that the CDOC medical staff monitored and treated Plaintiff's deep vein thrombosis regularly and carefully and regularly monitored Plaintiff's INR levels.  When Plaintiff's blood tests showed abnormal INR levels, his healthcare providers undertook steps to treat Plaintiff.  Plaintiff's disagreement with the treatment protocol, including medications prescribed, does not amount to deliberate indifference.  *See Perkins v. Kansas Dept. of Corrs.*, 165 F.3d 803, 811 (10th Cir.1999).

Again, Plaintiff has failed to provide evidence that Defendants "kn[ew] of and disregard[ed] an excessive risk to inmate health and safety."  *Farmer*, 511 U.S. at 837.  Plaintiff has not met his burden of demonstrating that a genuine issue for trial exists on his Eighth Amendment claims related to weight loss, constipation, pruritis, abdominal nodules, or improper prescriptions for his clotting disorder.

    ***vi.***  ***Discontinued Medications***

  Plaintiff alleges that Defendant Dowis, the Health Services Administrator at SCF,

    instituted policy that discontinued plaintiff's prior prescribed prescription
    medications and treatment, deemed medically necessary by Dr. Oba, M.D., Bent
    County Correctional facility. This discontinuation caused plaintiff's serious
    complications with his bloodclotting disorder, puritis, and extensive pain,
    suffering and potential life threatening bloodclots in upper and lower extremeties,
    enlarged lymph nodes, and catastrophic weight loss.

(Am. Compl. at 10, ¶ 6.)  Plaintiff also alleges Defendant Dowis has disregarded his serious

medical needs in an effort to save money.  (*Id.* and ¶ 15; Am. Compl. at 11, ¶ d.)

  Dr. Frantz explains that there is no policy mandating the discontinuation of medication

when an inmate moves from one facility to another.  (Mot. Summ. J., Ex. A, ¶ 44.)  Dr. Frantz

states that every inmate's medical status is reviewed periodically, and usually an inmate's

medical status is reviewed when he changes facilities.  (*Id.*)  Defendants argue that even if there

were such a policy, Plaintiff received medically appropriate medications at SCF.  (Mot. Summ. J.

at 27.)

  Dr. Frantz explains that the primary prescription Plaintiff received at BCCF was for

Coumadin to treat Plaintiff's deep vein thrombosis.  (*Id.*, Ex. A, ¶ 44.)  As detailed above,

Plaintiff has received that medication, and had his INR levels monitored, continuously since his

arrival at SCF.  In his response, Plaintiff asserts that Doxepin, Pepcid AC, and medicated lotion

have been discontinued.  (Resp. at 5, ¶ 9.)  The medical records show that Plaintiff was seen by

Defendant Stock in the clinic on January 10, 2008, and the clinic notes state, "he was on

Doxepin for chronic skin itching, and would like to have that renewed."  (Mot. Summ. J., Ex. A,

Attach. 2, Part 2, at 58.)  Plaintiff was given a three-month prescription for Doxepin.  (*Id.*)  On

February 10, 2009, Defendant Goldsmith saw Plaintiff for complaints of weight loss, severe

dermatitis with itching over the chest and back, and painful nodules in the abdomen and upper

thigh.  (*Id.*, Attach. 2, Part 1, at 47.)  Defendant Goldsmith noted, "Intensely pruritic maculo

papular dermatitis involving the anterior chest and the back.  5-6 mm. lesions in th subcu of the

abdomen and upper aanterior [sic] thighs that are exquisitely tender."  (*Id.*)  Defendant

Goldsmith prescribed medications for the rash and narcotic pain medication.  (*Id.*)  On March 20,

2009, Defendant Goldsmith evaluated Plaintiff and noted he "[s]till has pruritis and has not

recived [sic] ntihistamine [sic].  Will prescribe claritin."  (*Id.* at 44.)

   Other than these records over a three-month period, there is no indication Plaintiff ever

complained of a rash or itching skin.  Moreover, there is no evidence Plaintiff was given a

prescription for Pepcid AC, or that Plaintiff ever requested a prescription for Pepcid AC.

Finally, the record is devoid of any evidence that Defendant Dowis had any role in prescribing or

discontinuing medications or that any decisions to discontinue medications were based on an

effort to save money.  Plaintiff has failed to establish an affirmative link between the alleged

constitutional violations and Defendant Dowis's personal participation.  *See Butler*, 992 F.2d at

1055.

   As Plaintiff's allegations are not supported by the record, *see Thomson*, 584 F.3d at 1312,

Plaintiff has failed to satisfy the subjective prong of the deliberate indifference test as to his

claims that medications were discontinued in violation of his Eighth Amendment rights.

### vi.    *Hepatitis C*

Plaintiff generally alleges that Defendants have failed to provide the Plaintiff with proper and adequate medical care and treatment for Hepatitis C.  (Am. Compl. at 4.)  Defendants argue that Plaintiff has failed to show any defendants' personal participation in denying him care for Hepatitis C.  (Mot. Summ. J. at 29.)  Defendants also argue that Plaintiff is currently engaged in the CDOC's Hepatitis C protocol, and there is no evidence that he requires additional treatment at this time.  (*Id.*)

The court agrees that Plaintiff has failed to allege that any defendant personally participated in denying him care for his Hepatitis C.  Though Plaintiff states has been diagnosed with Hepatitis C (*see* Am. Compl. at 4, 11, 15 ), that he was treated for the disease while incarcerated in BCCF from April 2005 through December 2007 (*see id.* at 6), and that "[u]pon arrival at Sterling Correctional Facility, all previously prescribed medications and treatment for Plaintiff's chronic health conditions were discontinued without notice or medical evaluation" (*id.* at 11), Plaintiff wholly fails to allege any personal participation by any of the CDOC Defendants in the alleged constitutional violations.  As such, Plaintiff has failed to show that any defendant caused the deprivation of a federal right.  *Kentucky*, 473 U.S. at 166.  Regardless, Plaintiff's claims regarding the treatment of Hepatitis C fail because Plaintiff has failed to meet the subjective prong for the deliberate indifference test.

Dr. Frantz explains that the CDOC's treatment protocol for Hepatitis C is directed and controlled by a clinical standard developed on the published recommendations of the American Society for the Study of Liver Diseases (ASSLD).  (Mot. Summ. J., Exh. A, ¶ 24.)  The

36

treatment is complex, and it involves a 48-week regimen of interferon and ribarvirin. (*Id.*) The treatment is not benign, and it is not suitable for all patients. (*Id.*) In order for offenders to be eligible for the treatment, they must first complete six months of drug and alcohol classes. (*Id.*) Once an offender has completed drug and alcohol classes, a liver biopsy is performed to determine the patient's degree of liver injury. (*Id.*) Whether or not treatment is recommended depends on the results of the liver biopsy, in accordance with ASSLD guidelines. (*Id.*) Treatment with interferon and ribarvirin is provided to offenders if testing indicates that the benefits of treating the disease outweigh the risks of treatment. (*Id.*) Hepatitis C most frequently is asymptomatic and may be present for decades without progression. (*Id.*) Because the treatment for Hepatitis C carries substantial risks, treatment is not recommended for all patients. (*Id.*)

In his Response, Plaintiff states, "The [defendants] have full knowledge of the Plaintiff's Hepatitis C. They have not done a recent blooddraw [sic] for liver enzymes, they will not provide placement in the needed Drug and Alcohol treatment Program, Plaintiff has been on a so called waitng [sic] list for longer than 5 years to attend." (Resp. at 11.) Plaintiff also states he "has made every posible [sic] effort to obtain Interfuron [sic] treatment, the defendants' only avoid or put off treatment for Hepatitis C." (*Id.* at 12.)

In his reply in support of his motions for injunctive relief, Plaintiff attaches a letter dated July 28, 2009, from Ms. Estrada, Drug/Alcohol Counsel, advising Plaintiff that he would need "six months of reportable treatment" before he could be considered for Interferon treatment. (Reply. Mot. Prelim. Inj. and Mot. TRO. at 16.) Ms. Estrada suggests to Plaintiff that he "attend

AA groups as it is acceptable treatment" and that he "will receive 3 months of treatment from D & A group, and will need the additional AA to get the required 6 months." (*Id.*) Plaintiff states in his reply, filed June 8, 2010, that he "continues to request Interfuron [sic] treatment and attends N.A. weekly meetings." (*Id.* at 5, ¶ 20.)

Dr. Frantz states that Plaintiff will be evaluated for interferon treatment if he completes the drug and alcohol classes. (Mot. Summ. J., Ex. A, ¶ 24.) However, Dr. Frantz explains that based solely on Plaintiff's medical records, he has not shown clinical progression of Hepatitis C, and he does not require treatment at this time. (*Id.*) The records show that throughout his incarceration, Plaintiff has had numerous laboratory evaluations, including the evaluation of liver enzymes, to follow his Hepatitis C, and all of the tests have been normal. (*Id.*; *see e.g.*, Ex. A, Attach. 2, Part 1, at 25, 40.) Plaintiff also had a CT scan of the abdomen on June 17, 2009, and his liver was specifically noted to be normal. (*Id.*, Ex. A., ¶ 24; 37–38.) Moreover, Dr. Frantz states, and upon review of the medical records this court agrees, there is no evidence in the record that Plaintiff has complained of or mentioned symptoms of Hepatitis C. (*Id.*)

To the extent Plaintiff believes that interferon and ribarvirin treatment would be effective for him but the medical providers do not, under controlling Tenth Circuit law, this disagreement over the best course of treatment does not amount to deliberate indifference. *See Perkins v. Kansas Dept. of Corrs.*, 165 F.3d 803, 811 (10th Cir.1999) (disagreement about treating plaintiff's HIV with protease inhibitor was not deliberate indifference). Moreover, case law firmly establishes that prisoners do not have the right to receive any and all medical treatments that they choose. *Estelle*, 429 U.S. at 106.

All of the evidence led Dr. Frantz to conclude that Plaintiff has not shown clinical progression of Hepatitis C and that his Hepatitis C does not require treatment at this time. (Mot. Summ. J., Ex. A, ¶ 24.) Plaintiff has offered no contradicting evidence to show Defendants acted with deliberate indifference to his serious medical needs. Thus, Plaintiff has failed to demonstrate a genuine issue for trial on this issue, and Defendants are entitled to summary judgment. *Concrete Works, Inc.*, 36 F.3d at 1518.

### 4.      *Qualified Immunity*

Defendants also argue that, in the absence of a constitutional violation, they are entitled to qualified immunity. (Mot. at 32.) The doctrine of qualified immunity shields government officials from individual liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Because of the purpose underlying qualified immunity, courts address qualified immunity questions differently from other summary judgment decisions. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must meet a "heavy two-part burden." *Id.* The plaintiff must establish both 1) that an officer's conduct violated the plaintiff's federal statutory or constitutional rights, and 2) that the rights in question were clearly established at the time of their alleged violation. *See Thomas v. Durastanti*, 607 F.3d 655, 662 (10th Cir. 2010). If the plaintiff fails to satisfy either

part of this "heavy two-part burden," the court must grant the defendant qualified immunity and dismiss the deficient claims.

Plaintiff has not met his burden here. As described above, Plaintiff has not established that Defendants violated his rights under the Eighth Amendment. Accordingly, the court need not address whether such rights were clearly established. *See Thomson v. Salt Lake Cnty*, 584 F.3d 1304, 1312, n.2 (10th Cir. 2009). Defendants are entitled to qualified immunity.

## MOTIONS FOR PRELIMINARY INJUNCTION AND
## TEMPORARY RESTRAINING ORDER

Plaintiff seeks an order for "defendants, their successors, agents, employees, and all persons acting in concert with them to provide plaintiff with proper and adequate medical care and or transfer him to a full hospital facility that will provide said care." (Mot. Prelim. Inj. at 7.) Plaintiff also requests a temporary restraining order "to aid and Protect the Palintiff [sic] from more egregious and retaliative actions by Defendant(s) . . . ." (Mot. TRO at 2.)

A party seeking a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Resources Defense Council, Inc.*, — U.S. —, 129 S. Ct. 365, 374 (2008)). The Tenth Circuit has made it clear that "because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir.

40

2009) (quoting *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted). Consequently, granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989), "is the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). The same considerations apply to the issuance of a temporary restraining order. *See Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980).

Plaintiff has failed to establish each of the essential requirements for a temporary restraining order or preliminary injunction. First, as this court is recommending that Defendants be granted summary judgment on all of Plaintiff's claims for relief, there is not a substantial likelihood Plaintiff ultimately will prevail on the merits of this case. Second, Plaintiff has failed to show that he will suffer irreparable injury if his request for preliminary injunction is denied. Accordingly, Plaintiff's request for injunctive relief is properly denied at this time. Because Plaintiff has failed to satisfy each of the four prerequisites, his motions for preliminary injunction and temporary restraining order should be denied.

WHEREFORE, for the foregoing reasons, the court respectfully

RECOMMENDS

1. Defendants' "Motion for Summary Judgment" (Doc. No. 57) be GRANTED;

2. "Plaintiff's Motion for Preliminary Injunction and Supporting Memorandum of Law" (Doc. No. 5) be DENIED; and

3. "Plaintiff's Request for a Temporary Restraining Order" (Doc. No. 31) be DENIED; and

41

4.    This case be dismissed in its entirety, with prejudice.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may

serve and file written objections to the Magistrate Judge's proposed findings and

recommendations with the Clerk of the United States District Court for the District of Colorado.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A

general objection that does not put the district court on notice of the basis for the objection will

not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's

report and recommendation must be both timely and specific to preserve an issue for de novo

review by the district court or for appellate review."  *United States v. One Parcel of Real Prop.*

*Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to

make timely objections may bar *de novo* review by the district judge of the magistrate judge's

proposed findings and recommendations and will result in a waiver of the right to appeal from a

judgment of the district court based on the proposed findings and recommendations of the

magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579–80 (10th Cir. 1999) (a district court's

decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection

does not preclude application of the "firm waiver rule");  *One Parcel of Real Prop.*, 73 F.3d at

1059–60 (a party's objections to the magistrate judge's report and recommendation must be both

timely and specific to preserve an issue for *de novo* review by the district court or for appellate

review);  *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir.

1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had

waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 1st day of September, 2010.

BY THE COURT:

Kathleen M Tafoya
United States Magistrate Judge